126 P.3d 182 (2006)
Andrew ROMANOFF, in his official capacity as Speaker of the Colorado House of Representatives; and Joan Fitz-Gerald, in her official capacity as President of the Colorado Senate, Petitioners,
v.
STATE COMMISSION ON JUDICIAL PERFORMANCE, and Paul F. Miller; William Banta, Lance M. Sears, and Bradley A. Levin, in their official capacities as unseated appointees to the State Commission on Judicial Performance, Respondents.
No. 05SA330.
Supreme Court of Colorado.
January 9, 2006.
*183 Isaacson Rosenbaum P.C., Mark G. Grueskin, Denver, for Petitioners.
Paul Farley, Denver, Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, for Respondent Judicial Performance Commission.
Paul F. Miller, Pro se, Grand Junction.
William Banta, Pro se, Englewood.
Lance M. Sears, Pro se, Colorado Springs.
*184 Bradley A. Levin, Pro se, Denver.
BENDER, Justice.

I. Introduction
The current Speaker of the Colorado House of Representatives, Andrew Romanoff, and the current President of the Colorado Senate, Joan Fitz-Gerald, petition us under C.A.R. 21, in the nature of the writ of quo warranto, to determine which of four appointees should properly be seated on the State Commission on Judicial Performance.[1]
There exists a controversy whereby four appointed commissioners seek to fill two of the ten seats of the statewide Commission. Two of the Respondents, Lance W. Sears and Bradley A. Levin, have been appointed by Romanoff and Fitz-Gerald; and two other respondents, Paul F. Miller and William Banta, have been appointed by Petitioners' predecessors in office, Lola Spradley, former Speaker of the House of Representatives, and John Andrews, former President of the Senate. Because the four appointed commissioners seek to fill two seats, the work of the Commission is at a standstill. The Commission has been unable to select a chairperson, or a co-chairperson, and it has not been able to begin its statutory work to evaluate and prepare narrative profiles and recommendations for five judges on the court of appeals eligible for retention in this election year. Upon petition of the Petitioners, we issued an order to show cause to the Commission, itself, and to each of the four potential office holders, as respondents, to determine who are the lawful office holders.
In this rare instance, we exercise our discretion to consider a writ in the nature of quo warranto under C.A.R. 21. We do so because of the public importance of the State Commission's statutory mission to evaluate judges for the benefit of the voters and the need to resolve the conflicting statutory claims made by the Petitioners and the Respondents, Miller and Banta. To resolve this controversy, we must construe C.R.S. 13-5.5-102(1)(a) and (1)(b), which set forth the mandatory statutory terms of office of the commissioners, as well as the powers of the Speaker of the House of Representatives, the President of the Senate, and, under specific circumstances, the Commission, itself, to appoint commissioners.
In discharging the rule, we hold that subsection (1)(a) of this statute creates a regimen of fixed, four-year terms for each commissioner. Each commissioner's term begins on December 1 of an election year and ends in the election year four years later on November 30. We hold that subsection (1)(b) of this statute directs that when a Commission vacancy occurs, if the appointing authority here, either the Speaker of the House of Representatives or the President of the Senatefails to appoint a new commissioner within forty-five days of this vacancy, then that appointing authority loses its power of appointment for the vacant seat and the appointment power devolves to the Commission, itself, to fill this vacancy.
Accordingly, we discharge the rule in the following particulars. We direct the Commission to recognize Respondent Miller's appointment as valid and binding to replace Respondent Sears as a commissioner on the State Judicial Performance Commission for a term expiring November 30, 2008. We direct the Commission to appoint a commissioner to serve out the remainder of the President of the Senate's appointment for the Commission seat sought by Respondents Levin and Banta. The Commission's appointee shall serve for a term which will expire on November 30, 2006.

*185 II. Background of this Controversy
The State Commission on Judicial Performance consists of ten members. The statute authorizes the Speaker of the House of Representatives and the President of the Senate to appoint two commissioners each, one attorney and one non-attorney, to the State Commission on Judicial Performance. § 13-5.5-102(1)(a), C.R.S. (2005). The controversy before us involves two separate lines of appointing authority: (1) the Speaker's appointments of Respondents Sears and Miller; and (2) the President of the Senate's appointment of Respondents Levin and Banta.
The Speaker line of appointments began in December 1997 when the then-sitting Speaker of the House appointed Sears to a four-year term on the State Commission. On November 29, 2001, Sears was reappointed to a second four-year term, which was scheduled to end November 30 of 2005 (that date assumes that Sears's four-year term commenced on the date of appointment, as Petitioners argue). On January 6, 2005, then-sitting Speaker, Lola Spradley, appointed Miller to replace Sears, nearly a year before Sears's second four-year term was set to expire (that is, according to the argument of Petitioners). Speaker Spradley's appointment, made just before she left office, was based upon an interpretation of subsection 13-5.5-102(1)(a) that commissioners' terms should begin and end in even-numbered years and that their terms of office were fixed for a four-year period.[2] When Romanoff took over as Speaker of the House later in January 2005, he reinstated Sears and extended his term to November 30, 2006.[3]
The President of the Senate's line of appointments began with the then-sitting Senate President's appointment of Levin to the Commission in November 2001. Levin's four-year term was scheduled to expire November 30, 2005 (that is, again, according to the argument of Petitioners). Immediately before leaving office and based upon the same statutory interpretation underlying Spradley's appointment of Miller, then-President of the Senate, John Andrews, appointed William Banta to replace Levin on January 3, 2005.[4] Upon assuming the presidency of the Senate on January 10, 2005, Respondent Fitz-Gerald reinstated Levin and extended his term to November 30, 2006.
Since the reinstatements of Sears and Levin, they, along with Miller and Banta, have been attempting to serve on the Commission. Because of this controversy, the Commission has been unable to perform the bulk of its statutory duties. Speaker Romanoff and President Fitz-Gerald now petition this court under C.A.R. 21 to consider a writ in the nature of quo warranto to establish the lawful officeholders.

III. Background Necessary to Understand the Legislative Analysis
The underlying inquiry in this case requires us to determine the legislative intent of the governing statutes. We begin by briefly examining the role of the Commission. We next discuss the writ of quo warranto and analyze our jurisdiction to issue such a writ in this matter. Finally, we apply the relevant statutory authority and case law to determine which of the four appointments are legally valid.

A. State Commission on Judicial Performance
In 1966, the people of Colorado voted to amend the Colorado Constitution to require the appointment of state judges and justices according to a merit-based system. Colo. Const. art. VI, § 24. This scheme replaced what has been called a "disastrous" system in which judges and justices were elected on a political ticket. Hearing on HB 88-1079 Before the H. Comm. on Judiciary, 1988 Leg., *186 56th Sess. (Colo.1988) (statement of Frank Plaut, President, Colo. Bar Ass'n).
This constitutional amendment mandates, among other directives, that judges and justices who wish to retain their offices must be approved by voters in a retention election. Colo. Const. art. VI, § 25. However, after the experience of various retention elections, the General Assembly became aware that the electorate did not always have access to sufficient information to allow them to assess judges and justices who were on the ballot for retention. Hearing on HB 88-1079 Before the H. Comm. on Judiciary, 1988 Leg., 56th Sess. (Colo.1988) (statement of Rep. Bath, Member, H. Comm. on Judiciary). In order to fill this informational void, the General Assembly enacted legislation in 1988 to evaluate judicial performance statewide by district, using uniform criteria, through the creation of Commissions on Judicial Performance for each district. § 13-5.5-101, C.R.S. (2005).
In addition to the district Commissions on Judicial Performance, this legislation established a State Commission on Judicial Performance, the entity involved in this action. The State Commission oversees the district Commissions, ensures that district retention evaluations are appropriate, and evaluates performance of all statewide appellate judgesnamely, the judges of the Colorado Court of Appeals and the justices of the Colorado Supreme Court. See §§ 13-5.5-103, 106, C.R.S. (2005). The State Commission comprises ten members who are appointed by officials from all three branches of government. Id. § 102. In addition to the four appointments by the Speaker and President of the Senate, the Governor and Chief Justice of the supreme court each appoint three members, one attorney and two nonattorneys. Id. The legislative intent behind the tri-branch appointment structure was to create a nonpolitical Commission. Hearing on HB 88-1079 Before the Conference Comm., 1988 Leg., 56th Sess. (Colo.1988) (statement of Sen. Claire Traylor, Member, Sen. Comm. on Judiciary and bill sponsor).
The Commission must start its work early in an election year in order to fulfill its statutory and constitutional timeframes so that its completed evaluations are accessible to the public and mailed statewide to electors thirty days before the election. This year's general election is set for November 7. See § 1-1-104(17), C.R.S. (2005). Thus, the Commission must finalize its draft evaluation and draft narrative profile of each appellate judge by approximately June 22, "no later than forty-five days prior to the last day available for the appellate justice or judge to declare ... [her] intent to stand for retention." § 13-5.5-106(1)(a), C.R.S. (2005). This date, the last date available for the judge to declare an intent to stand for retention, must be no later than three months before the date of the general election, according to the Colorado Constitution article VI, section 25. In this case, that date is approximately August 7. The Commission must make the final narrative profile and recommendations available to the public by approximately September 22, "no later than forty-five days before the retention election." § 13-5.5-106(1)(c), C.R.S. (2005). A summary of this narrative profile and recommendation is then printed in the ballot information booklet, which must be mailed to electors by approximately October 7, thirty days before the election. See id.; §§ 1-40-124.5, 125, C.R.S. (2005).
However, in order to meet these mandatory statutory and constitutional deadlines, the Commission must begin its work well before June 22. Jane Howell, the current Staff Director of the Commission, reports by affidavit attached to the petition that five judges of the court of appeals are standing for retention in November 2006. She summarizes the work the Commission must do to perform its statutory duties in this election year to evaluate the five appellate judges. In March, the commissioners and the judges will receive the results of an independent, professional survey of each appellate judge. The surveys are confidential and solely for the benefit of the Commission. The commissioners then will meet with the Chief Judge of the court of appeals, make one unannounced visit to the courtroom, and conduct confidential interviews with the judges standing for retention. Within ten days of these interviews, the Commission will provide a draft narrative profile to the judge and/or a *187 draft recommendation concerning retention. The evaluated judge must have an opportunity to meet with the Commission within ten days of the judge's receipt of these drafts. § 13-5.5-106(1)(a), C.R.S. (2005).
Having provided a brief overview of the State Commission on Judicial Performance and its duties, we turn to an examination of the relief requested and the court's power to grant it.

B. Jurisdiction Under C.A.R. 21
The Colorado Constitution vests the Colorado Supreme Court with jurisdiction to issue writs in the nature of quo warranto:
The supreme court shall have power to issue writs of ... quo warranto.
Colo. Const. art. VI, § 3.
A proceeding in quo warranto lies to determine "whether a person is illegally holding a public office or to test the validity of the legal existence of a governmental body." Leonard P. Plank & Anne Whalen Gill, Colorado Appellate Law and Practice § 15.9, at 224 (1999). The writ protects the interest of the public, but does not promote private rights. Id. We will issue quo warranto writs only rarely because of the availability of relief in the district courts under C.R.C.P. 106. Id.; see also William H. ReMine, Original Proceedings in the Colorado Supreme Court, 12 The Colorado Lawyer 413, 418 (March 1983).
Rule 21 sets forth procedures for the exercise of our original jurisdiction. C.A.R. 21. It encompasses all forms of writs cognizable under the common law, including quo warranto. C.A.R. 21(a)(2). Relief under this rule is extraordinary in nature and is a matter wholly within our discretion. C.A.R. 21(a)(1). We do not grant this relief except in important circumstances when no other adequate remedy exists. Id.
A person whose official duties under law include appointments to a public office has standing to petition for C.A.R 21 relief in the nature of quo warranto. People ex rel. Lamm v. Banta, 189 Colo. 474, 542 P.2d 377, 378 (1975) (recognizing that the Governor of the State of Colorado, as appointing authority for members of the Colorado Highway Commission, has standing to bring C.A.R. 21 petition in quo warranto). The issue in Banta was whether the persons the Governor appointed to the office of highway commissioner were entitled to take their seats in place of certain incumbent commissioners. Id. After their terms had expired, those incumbent commissioners were continuing to act in office pursuant to provisions of the Colorado Constitution that require office holders to exercise their official duties until their successors become qualified to hold office. Id. at 379. The relevant provision of the Colorado Constitution states that "[e]very person holding any civil office under the state ... shall, unless removed according to law, exercise the duties of such office until his successor is duly qualified." Colo. Const. art. XII, § 1.
Like Banta, the case before us involves conflicting appointments made by appointing authorities to the same Commission seats. By virtue of their offices, Romanoff, as Speaker of the Colorado House of Representatives, and Fitz-Gerald, as President of the Senate, hold the authority under section 13-5.5-102(1)(a) to appoint members of the State Commission on Judicial Performance when a vacancy in that office exists.
By means of affidavits of Jane Howell, Staff Director of the Commission, and Jean Dubofsky, current member of the Commission, attached to the C.A.R. 21 petition, the Commission informs that: (1) it is unable to determine who of these four persons validly holds the two seats on the Commission; and (2) the Commission's statutory duties to evaluate the performance of appellate judges and to supervise the operation of the twenty-two district commissions require the immediate resolution of this controversy in this election year.
The dispute involving which two of these four respondents hold the office of commissioner is a matter of immediate and important public concern. The work of the Commission is critical to the operation of the retention systemespecially now, at the onset of an election year. To fulfill its statutory duties, the Commission needs ten working *188 members.[5] If the Commission does not operate with its ten lawful commissioners, then its operation will be ineffective at best, paralyzed at worst.
Necessity calls for us to resolve this controversy as quickly as possible. We find there is no other adequate remedy available here because relief under C.R.C.P. 106 would not be timely and our resolution of this controversy involves no factual disputes. Validly seated members of the Commission have critical statutory responsibilities to discharge in a timely manner during this general election year of 2006, and accordingly, we find it proper for two of the appointing authorities to the Commission to request the supreme court to address this issue under the auspices of a writ in the nature of quo warranto under C.A.R. 21.
We therefore proceed to determine which of the conflicting appointments made by two successive holders of the office of Speaker of the House of Representatives and two successive holders of the office of President of the Senate are legally valid.

IV. Analysis

A. Introduction
Petitioners Romanoff and Fitz-Gerald contend that the former Speaker of the House, Spradley, and the former President of the Senate, Andrews, improperly removed two appointees, Sears and Levin, and made two invalid appointments, Miller and Banta, as new Commission members in early January 2005. Romanoff and Fitz-Gerald argue that the Judicial Performance Statute requires that each of the commissioners serves a term of four years, with each appointee's four-year respective term beginning on the date of the appointment. From their perspective, the date of appointment marks the beginning of the term, even if the appointment occurs in an odd-numbered year. Respondents Miller and Banta (the Spradley and Andrews appointees) argue that the Commission Statute mandates that the four-year terms begin December 1 of even-numbered years and expire four years later on November 30, irrespective of the year or time of year the Speaker or the President made the commissioner's appointment. The language of the statute, supported by the legislative history of the 1997 amendments to this statute, is consistent with the positions advanced by Respondents Miller and Banta.

B. The Commission Statute mandates fixed, four-year terms beginning in December of an election year, and ending four years later on November 30.
When interpreting a statute, we begin with established canons of statutory interpretation. First, we strive to adopt a construction that best gives effect to the legislative purposes. Spahmer v. Gullette, 113 P.3d 158, 162 (Colo.2005). In doing so, our starting point is the plain meaning of the language used. Id.; see also § 2-4-101, C.R.S. (2005). We construe the language in a manner that gives effect to every word. Spahmer, 113 P.3d at 162. We also must consider the language in the context of the statute as a whole. See Anderson v. Longmont Toyota, Inc., 102 P.3d 323, 327 (Colo. 2004); see § 2-4-201(1)(b), C.R.S. (2005). However, when a statute is "reasonably susceptible to more than one meaning," we may consider other indicators, such as legislative history. Water Rights of Park County Sportsmen's Ranch L.L.P. v. Bargas, 986 P.2d 262, 268 (Colo.1999); see also § 2-4-203(1)(c), C.R.S. (2005).
We turn to the words of subsection (1)(a), enacted in 1988, which state that the Commission "shall consist of ten members... [and a]ll members of the [state] commission shall serve terms of four years." § 13-5.5-102(1)(a), C.R.S. (1988) (emphasis added). Subsection (1)(a) provides a single, specific exception to this four-year mandatory term by stating that one of the two persons initially appointed by each appointing authority the Speaker, the President, the Governor, and the Chief Justice of the Supreme *189 Court"shall serve for a term of two years" and, that, in addition, "[a]ll initial appointments shall be completed by July 1, 1988." Id. (emphasis added).
The state commission shall consist of ten members. The speaker of the house of representatives and the president of the senate shall each appoint two nonattorneys. The governor and the chief justice of the supreme court shall each appoint two attorneys and one nonattorney. All members of the state commission shall serve terms of fours years; except that, of those first appointed, one person appointed by each appointing authority shall serve for a term of two years. All initial appointments shall be completed by July 1, 1988.
Id.[6]
The plain language of the statute reveals an intent of the legislature to require: (1) that all ten initial commissioners have a term of office beginning on July 1, 1988; and (2) that all commissioners, except those four initially appointed for a term of two years, with terms ending July 1, 1990, will have terms of office of four years. This legislation establishes a regimen of staggered terms by having fixed, four-year terms beginning July 1, 1988, and four commissioners having fixed, four-year terms beginning July 1, 1990. The commissioners' terms, while staggered every two years, all were intended to begin July 1 and end June 30 of even-numbered years. The General Assembly did not appear to contemplate that terms would commence on any other date and did not explicitly address when appointments not made by July 1 would end, except in the context of appointments made to fill vacancies created when commissioners failed to complete a term. In that case, the statute mandated the appointment "expire when the term of the departed member would otherwise have expired." Id. § (1)(b).
However, in 1997, the legislature amended subsection (1)(a) to change the beginning and ending dates of Commission members' terms. For those commissioners serving as of June 30, 1997, the amendment changed their terms of office to expire on November 30 of the year in which their respective terms were set to expire, rather than on June 30 of that same year as required by the original 1988 legislation. For those commissioners appointed on or after July 1, 1997, the amendment mandated that their respective terms "shall commence on December 1 of the year in which the previous member's term is scheduled to expire." § 13-5.5-102(1)(a), C.R.S. (2005). The effect of this amendment is to change the beginning date of each commissioner's term of office to December 1 of an even-numbered year and set the ending of the term on November 30 of an even-numbered year:
The term of any member of the state commission serving as of June 30, 1997, shall expire on November 30 of the year in which the term is scheduled to expire. The term of any member appointed on or after July 1, 1997, to replace a member of the state commission at the end of his or her term shall commence on December 1 of the year in which the previous member's term is scheduled to expire.
Id.
The explicit use of the word "term" and the phrase "scheduled to expire" create a statutory regimen, set up by the initial 1988 legislation, of four-year terms that begin and end according to a fixed schedule as set forth in subsection (1)(a). As explained earlier, the State Commission must complete its evaluations of the performance of all statewide appellate judges standing for retention approximately four and one-half months before those judicial officers' retention elections. This work must begin early in an election year as is contemplated by the time deadlines set forth by the statute and by the Colorado Constitution. Judicial retention elections, as part of general elections, are held only in November of even-numbered years. § 1-1-104(17), C.R.S. (2005) (defining "general election" as "the election held on the Tuesday succeeding the first Monday of November in each even-numbered year"); *190 Colo. Const. art. VI, § 25 (linking judicial retention elections to the biennial general elections). Hence, we conclude that the intent of the 1997 amendments to subsection (1)(a) is to prevent a commissioner's term from either ending or beginning in the middle of the Commission's important work.
Former El Paso District Court Judge, Matt M. Railey, as Co-Chair of the Commission then, testified that this amendment to subsection (1)(a) though "mundane" was "very necessary." Judicial Review Commissions: Hearing on HB 97-1037 Before the H. Comm. on Judiciary, 1997 Leg., 61st Sess. (Colo.1997) (statement of Matt Railey, Co-Chairman, State Comm'n on Jud. Performance). He testified that when he was appointed, he joined the Commission in the middle of the process of evaluating appellate judges for retention, "making it hard to get up to speed and work on" those recommendations. Id. This need to amend the statute to provide continuity and adequate time for the evaluation and recommendation process of the Commission was reiterated by Lawrence W. DeMuth, then-Chair of the Board of Directors of Colorado's Judicial Institute. Id. (statement of Lawrence DeMuth, Jr., Chairman of the Bd. of Dirs., Colo. Jud. Inst.).
Our review of the legislative history concerning the 1997 amendments to subsection (1)(a) provides no support for Petitioners Romanoff's and Fitz-Gerald's argument that the General Assembly was aware of the past practice of appointment of commissioners in odd-numbered years, and that the General Assembly intended to change the fixed, four-year terms to begin on the date of appointment rather than on the even-numbered years set forth by the initial 1988 legislation contained in subsection (1)(a).
The 1997 amendment to subsection (1)(b) is consistent with the plain language and legislative history of subsection (1)(a). The legislature amended subsection (1)(b) to require the Commission, itself, rather than the appointing authority, to exercise the appointment power for a new Commission member if the original appointing authority fails to make a timely appointment forty-five days after a vacancy occurs. This new language, which requires the Commission to appoint a new commissioner if the appointing authority does not act, contains no language to indicate that, when the Commission exercises this new power of appointment, the date of the Commission's appointment of the new commissioner becomes the date when the new commissioner's four-year term begins. In addition, this 1997 amendment does not place a time limit past the forty-five days by which the Commission must make this appointment. Thus, if terms of office started at the time of appointment, they would not be fixed and, in fact, could be widely scattered.
To construe subsection (1)(b) in the manner supported by Petitioners would be contrary both to the old and to the new language of subsection (1)(a) which, when taken together, mandate a fixed term of office beginning on December 1 of an election year and expiring four years later, on November 30 of an election year. And, as noted, it would also result in no fixed terms and a plethora of unevenly staggered termsa result not intended by the legislature.
The language of section 13-5.5-102(1)(a) and the statutory scheme as a whole, when combined with its legislative history, do not support an interpretation that the General Assembly intended commissioners to end or begin office less than a year before a retention election. The actual date of a commissioner's appointment does not affect the length of term the commissioner fills upon a valid appointment. Because the General Assembly amended the statute to require terms to expire mere weeks after the early-November election season, we hold that section 13-5.5-102 mandates fixed, four-year terms which begin and end in even-numbered years. A different schedule would disrupt the Commission's work and thwart its mission.

C. The Commission must appoint a new commissioner if the appointing authority fails to do so within 45 days of a vacancy.
Having established that the statute requires fixed terms of four years, we now examine the manner in which Commission vacancies must be filled when a commissioner *191 leaves office before the end of a full, four-year term and when a commissioner continues in office beyond the end of a full, four-year term. And we also analyze the limits on the duration of the appointment power of the Commission under subsection (1)(b).
As discussed, subsection 13-5.5-102(1)(b) requires vacancies to be filled by the appointing authority within forty-five days after the vacancy occurs. If the appointing authority does not do so, then the Commission must make the appointment. Subsection (1)(b) also mandates that no member may serve more than two full terms, plus the remainder of a vacated term if that member was initially appointed to finish an unexpired term of office.
The plain language of subsection (1)(b) indicates that when a commissioner is appointed to fill an unexpired term, he or she serves the remainder of that term. This language, combined with the intent of the legislature to create fixed, four-year terms, brings us to the heart of the issue before us.
Prior Speakers and Presidents made appointments for periods both longer and shorter than four-year terms. The appointing authorities then made subsequent appointments in odd-numbered years for four years starting when those irregular terms ended. In situations where the irregular term was shorter than four years, the statute mandates that the subsequent appointee's term could only have been as long as the amount of time remaining in the prior appointee's unfinished four-year term.
Cases where the irregular term was longer than four years create a different problem. To analyze that type of situation, we return to Banta. In that decision, we interpreted the "holdover provision" of Colorado Constitution article IV, section 6. Under that provision, a "person holding any civil office under the state ... shall, unless removed according to law, exercise the duties of such office until his successor is duly qualified." Colo. Const. art. XII, § 1. We noted that the language of this holdover provision defines an officer who continues to occupy his office after its term has expired as a "de facto" officer. Banta, 542 P.2d at 381. Based on this definition, we held that "a vacancy occurs when the term of office expires," even if the de facto officer is still occupying the office. Id. The de facto officer, in effect, occupies a technically vacant office until the next officer is appointed, but nonetheless, the de facto officer possesses "the authority to discharge the duties of the office." Id. at 380.
Thus, under Colorado Constitution article XII, section 1, a commissioner appointed to a term longer than four years, in violation of the statute, becomes a de facto officer at the end of four years when the term expires pursuant to statute. Consequently, the next appointee, whether the same commissioner or another individual, could only be appointed to a term equal to the remainder of the four-term that began running at the end of the first four-year term.
Turning to address the duration of the Commission's appointment power under subsection (1)(b), we conclude that this statute creates a finite window of time within each fixed, four-year term of office during which the Commission may exercise its appointment power. Under Banta, "a vacancy occurs when the term of office expires." Id. at 381. Because the Commission Statute mandates that, when a vacancy occurs, the Commission shall appoint a new commissioner if the appropriate appointing authority fails to do so within forty-five days of that vacancy, the Commission's appointment power begins forty-five days after an appointing authority fails to make an appointment to a vacant office and ends when that term of office expires.[7] When a term of office ends or expires, the appointment power returns to the appropriate appointing authority, who must act within the next forty-five days.
This interpretation of subsection (1)(b) furthers the purpose and the framework of the Commission Statute. In this manner, the intended appointing officers, rather than the Commission, will retain the primary appointment *192 powers. The Commission will exercise its appointing powers in limited circumstances to ensure that the Commission enjoys its full statutory body of ten working members. In addition, the system of fixed statutory terms is preserved. To construe subsection (1)(b) otherwise could cause a specific office to lose its appointment power indefinitely, because if the office holder failed to act within forty-five days, then the Commission could also fail to act, causing an indeterminate vacancy and reducing the number of Commissioners. Thus, we hold that an appointing authority's power of appointment is renewed at the start of each four-year term of office.
We now apply the applicable law to both lines of appointments in question.

V. Application
As part of the Speaker line of appointments, the term of office occupied by Sears expired November 30, 2004, creating a vacancy. Once the office was vacant as of November 30, 2004, then-Speaker Spradley had forty-five days to appoint a replacement, pursuant to subsection 13-5.5-102(1)(b). Spradley appointed Miller on January 6, 2005, which was within forty-five days of the vacancy. Hence, Miller's appointment is valid and Sears was appropriately replaced by new commissioner Miller.
We next address the President of the Senate's line of appointmentLevin and Banta and the reinstatement of Levin. Levin was appointed in 2001, three years into the 1998-2002 term.[8] Thus, Levin's appointment was only for the remainder of that term, until November 30, 2002. Upon that date, his office on the Commission was vacant. Levin became a de facto officer, and the President of the Senate had forty-five days from December 1, 2002, to appoint a commissioner to the office for the next term. However, the President of the Senate, Andrews, did not appoint Banta until January 3, 2005, more than two years after the vacancy existed. Later in January of 2005, Petitioner Fitz-Gerald, the new President of the Senate, reinstated Levin and extended his term of office until November 30, 2006, also more than two years after the vacancy existed. Thus, neither Banta's nor Levin's appointments are valid because both occurred well after the forty-five-day time limit mandated by the statute. Therefore, pursuant to subsection (1)(b), the State Commission is now charged with appointing a replacement to serve out the remainder of the vacant 2002-2006 term.

VI. Conclusion
For the reasons stated, we discharge the rule to show cause and declare the following: (1) the Speaker of the House of Representative's appointment of Miller to replace Sears is valid; (2) the President of the Senate's appointments of Levin and Banta are invalid; and (3) the State Commission on Judicial Performance is required to appoint, on behalf of the President of the Senate pursuant to section 13-5.5-102(1)(b), a commissioner to serve the remainder of the current term ending November 30, 2006.
Chief Justice MULLARKEY and Justice RICE do not participate.
NOTES
[1] Romanoff and Fitz-Gerald petition us in their official capacities as Speaker of the House and President of the Senate respectively. Both Romanoff and Fitz-Gerald appear before us as party petitioners and are two appointing authorities to the State Commission on Judicial Performance. They have also asserted their authority to petition us on behalf of the People of the State of Colorado and the Colorado General Assembly. Because we base our jurisdiction to intervene in this case on the request of the appointing authorities, we do not consider whether Petitioner Romanoff or Petitioner Fitz-Gerald may act on behalf of either the People of the State of Colorado or the Colorado General Assembly. Accordingly, we strike the People of the State of Colorado and the Colorado General Assembly from this case and remove their names from the caption of this case. In addition, we note that the Respondent Commission, another statutory appointing authority, also requests that we entertain this case.
[2] Even though she made the appointment in 2005, Spradley's appointment of Miller was for a term scheduled to begin on December 1, 2004.
[3] We note that from the affidavits supplied with the petition, there existed a practice, by appointing authorities over numerous administrations, of appointing commissioners in odd-numbered years for full, four-year terms.
[4] Even though he made the appointment in 2005, Andrews's appointment of Banta was for a term scheduled to begin on December 1, 2004.
[5] The purpose behind the vacancy-filling provisions, subsection (1)(b) of the Commission Statute, added by the 1997 amendment, was to ensure that the Commission operates with ten members. Judicial Review Commissions: Hearing on HB 97-1037 Before the H. Comm. on Judiciary, 1997 Leg., 61st Sess. (Colo.1997) (statement of Rep. T. Williams, bill sponsor).
[6] The current version of the statute provides that the Speaker and President "each appoint one attorney and one nonattorney," and that the Governor and Chief Justice "each appoint one attorney and two nonattorneys." § 13-5 5-102(1)(a), C.R.S. (2005).
[7] We analyze this issue in the context of vacancies created when a term of office expires. But this analysis also applies when a commissioner leaves office before the end of the term, creating a vacancy.
[8] Parenthetically, we point out the reason Levin's term ran from 1998 to 2002. This President of the Senate line of appointments began with a two-year term in 1988, followed by successive four-year terms beginning in 1990.